IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

## STATE OF TENNESSEE v. JAMARCUS JACKSON

**Appeal from the Criminal Court for Washington County
No. 39612    Stacy L. Street, Judge**

_____

### No. E2017-01182-CCA-R3-CD

_____

The Defendant, Jamarcus Jackson, was convicted by a Washington County Criminal Court jury of second degree murder, misdemeanor assault, and misdemeanor reckless endangerment, for which he is serving an effective forty years, consecutively to an eight-year sentence in an unrelated case.  *See* T.C.A. §§ 39-10-210 (2014) (second degree murder), 39-13-101 (Supp. 2013) (amended 2016) (assault), 39-13-103 (2014) (reckless endangerment).   On appeal, he contends that (1) the evidence is insufficient to support his second degree murder conviction, (2) the trial court erred in its method of conducting jury selection, depriving him of a peremptory challenge, (3) the court erred in ruling that his prior failure to appear and robbery convictions were admissible impeachment evidence if he testified, (4) he is entitled to a new trial due to cumulative trial error, and (5) his sentence is excessive.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE., JJ., joined.

Lesley A. Tiller (on appeal); Gene Scott (at trial); and Donna Bolton (at trial), Jonesborough, Tennessee, for the appellant, Jamarcus L. Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Ken C. Baldwin, District Attorney General; Ken Baldwin and Fred Lance, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to events that occurred at The Battery, a Johnson City nightclub, in the early morning hours of March 23, 2014.   The second

degree murder conviction relates to the shooting death of Deshaun Greer.[1]  The assault conviction relates to Zachary Breedlove, and the reckless endangerment conviction relates to Jonathan McInturff.

At the trial, Amanda Chappell, testified that she had been on two or three dates with the Defendant before March 23, 2014.  She said that on the night of the relevant events, they went to The Battery to celebrate the Defendant's birthday.  She said she picked up the Defendant in the late evening, although she did not recall the time.  She said that as she drove, she saw that the Defendant had a small gun in the floorboard.  She said the gun was not a revolver but did not know if it was a semi-automatic weapon.  She said she was "[a] little bit" concerned about the Defendant's having the gun.  She did not know where the gun was located when they got out of the car at the club.

Ms. Chappell testified that she bought drinks for the Defendant in the club but did not recall how many.  She said that she saw the Defendant talking with a man and that the Defendant held a beer bottle as if he were going to hit the man.  She said the victim was walking around while the Defendant and the man talked.

Ms. Chappell testified that she and the Defendant were about to leave when she saw the victim and someone who resembled the victim looking at the Defendant.  She said she later learned the men were brothers.  She said she was concerned that an altercation might occur.  She said that as she and the Defendant stood by the bar in the back of the club after the Defendant finished his conversation, the victim "bumped" the Defendant intentionally and bumped her.  She later said she lost her footing when the victim bumped the Defendant, causing the Defendant to bump into her.  She said the victim and the Defendant had words.  She said, "[T]he younger brother cuts in front of [the Defendant,] and they're right in each other's face."  She said she told the "other guy" to "leave it alone" and told the Defendant that she and the Defendant should leave.  She said she was concerned about the Defendant getting into a fight because "there had already been previous arguments that night" and because the Defendant had been drinking.  When asked whether he was sober, she responded, "[H]e shouldn't be driving."

Ms. Chappell testified that she saw the victim approach after the Defendant and "the younger brother were talking."  She said that the younger brother gestured as if he were pointing at the Defendant and that fights involving ten to twelve men broke out.  She said the Defendant, the victim, and the victim's brother did not fight.  She did not

---

[1] For simplicity, we refer to Mr. Greer as "the victim" in this opinion, but we acknowledge that multiple individuals were injured.

know the time but thought the club's lights had come on, signaling "last call." She said the bouncers attempted to get the patrons to leave because things were "out of control."

Ms. Chappell testified that she saw the Defendant leave and attempted to follow but had difficulty because she wore high heels. She said that she asked him to wait for her but that he did not. She said the Defendant did not sprint but moved quickly to her car, which was a distance away. She said the Defendant was angry, which was a state in which she had never seen him. She said he was loud and "breathing hard." She said that when she reached the car, the Defendant stood by the passenger side waiting for her to unlock it. She said the Defendant searched the floorboard and asked, "Where's my gun[?]" She later said that he asked, "[W]here the F is my gun" and that he forcefully slammed back her car seat. She said she told the Defendant that "a man sitting down there . . . saw him" get into her car. She said that she asked the Defendant what he wanted her to do and that he told her she could leave if she wanted. She said she replied that she was not going to leave the Defendant there.

Ms. Chappell testified that she saw the Defendant put the gun in the back of his pants and walk toward The Battery. She said she sat in the car for about one minute but returned to The Battery after hearing gunshots. She said that she saw someone lying down, that she looked at the person's shoes to see whether it was the Defendant, but that it was not. She looked for the Defendant and found him lying at the bottom of some steps. She thought the Defendant hit his head "because he wasn't . . . all there." She said that several people restrained the Defendant and that she waited to leave until the police arrived and took the Defendant.

Ms. Chappell denied that any police officer told her not to talk to defense counsel but acknowledged she had spoken to the prosecutors once or twice. She said that she did not speak to the police that night and that the police did not know of her involvement "for a very long time." She acknowledged that she had not told the police about the Defendant's asking where his gun was when they returned to the car after being inside the club. When asked why she did not tell the police initially about having seen the Defendant put the gun into his pants, she said she had been nervous. When asked about the current state of her relationship with the Defendant, she said she had not spoken to him in a long time.

John Calandros testified that he was employed as a bouncer at The Battery on March 23, 2014. Mr. Calandros said that he began focusing on the Defendant after seeing the Defendant in an incident with a patron other than the victim. When Mr. Calandros was asked if he saw the Defendant become involved in an incident with the victim or the victim's brother, Mr. Calandros said, "[I]t looked like they kind of bumped

-3-

shoulders and started talking aggressively toward one another." Mr. Calandros said that both men appeared to have hostility toward one another during this encounter. Mr. Calandros did not know where the victim's brother was during the exchange and did not see any encounter between the Defendant and the victim's brother inside the bar. Mr. Calandros said that he and another bouncer, Aaron Phillips, separated the men and that the Defendant punched Mr. Phillips in the face. Mr. Calandros said that a fight erupted between the victim's younger brother and a person whose name Mr. Calandros did not know. Mr. Callandros said he had not seen the entire interaction between the Defendant and Mr. Phillips because Mr. Calandros had to attend to another fight. Mr. Calandros agreed that the atmosphere inside the club became chaotic shortly before the bouncers began herding the patrons outside due to the fighting.

Mr. Calandros said that the victim and the victim's brother wanted to go outside and that the victim stated the Defendant had hit him in the face with a beer bottle. Mr. Calandros explained that he had not seen the Defendant strike the victim but that he saw a "large pumpknot" on the victim's face. Mr. Calandros stated that the Defendant "had fled" by this point. Mr. Calandros stated, however, that he did not see the Defendant leave but that he did not see the Defendant inside the club after the patrons had been herded outside. Mr. Calandros said the victim stated that he had bail money and did not care if he went to jail for fighting. Mr. Calandros said he calmed the victim, who initially wanted to retaliate and fight the Defendant. Mr. Calandros said that he tried to keep the victim inside to keep the victim away from the Defendant and that he them outside. Mr. Calandros explained that he calmed the victim's brother more than the victim because the victim's brother was agitated about the fight in which he had been involved. Mr. Calandros stated that a large crowd of fifty to 100 people was gathered outside.

Mr. Calandros testified that he did not usually work in the parking lot but that he had followed the victim and the victim's brother to ensure that they left. He said he heard the crowd saying, "[T]here he is, get him." Mr. Calandros said that the victim turned and that Mr. Calandros saw the Defendant "coming up the street" on foot with his hands at his sides. Mr. Calandros said the victim turned and walked casually toward the Defendant until they were four to six feet apart. Mr. Calandros said that the victim's brother also walked toward the Defendant but that the victim was closer to the Defendant than the victim's brother. Mr. Calandros stated that the Defendant pulled out a gun from the Defendant's mid-back and began shooting. Mr. Calandros stated that he heard a couple of shots, that he felt something possibly grazing his leg, and that he dove down. He said he heard more than five shots. He said that everything happened within a matter of seconds. Mr. Calandros said that although the victim had been "riled up" earlier, the victim was calm by the time the victim walked outside.

-4-

Mr. Calandros testified that by the time he stood, another bouncer, Michael Parr, was on top of the Defendant in the lower parking lot. Mr. Calandros stated that another bouncer, "Devin,"[2] assisted Mr. Parr in restraining the Defendant. Mr. Calandros said the location where the bouncers had restrained the Defendant was different than where he had last seen the Defendant before Mr. Calandros dove to the ground. Mr. Calandros stated that Mr. Phillips took the gun from the Defendant and that one of the club's disc jockeys, John Lawson, kept the gun until the police arrived.

Mr. Calandros testified that the victim's brother was in the lower parking lot trying to get to the Defendant while the Defendant was restrained. Mr. Calandros said Mr. Parr kept the victim's brother from attacking the Defendant while the Defendant was restrained. Mr. Calandros said he had not seen any interaction between the Defendant and the victim's brother before the shooting. Mr. Calandros was unsure where the victim's brother had been when the shooting began. Mr. Calandros identified the Defendant as the person he saw firing shots on March 23, 2014.

James Phillips testified that he was employed working "security" at The Battery on the early morning of March 23, 2014. He said that the victim punched him in the face with a fist, knocking him to the ground. Mr. Phillips said that he had not interacted with the victim before the victim hit him and that Mr. Phillips had been "dealing with" someone else at the time. Mr. Phillips said that he stood and told a bouncer what had happened but that the victim had already left the club. Mr. Phillips said he did not see the victim and the Defendant interacting inside the club.

Mr. Phillips said he and other employees cleared the club of patrons and began "doing our sweeps in the parking lot just like a normal night." He said that at some point, he saw the Defendant coming from the side of the building toward the front steps of the club. Mr. Phillips agreed that the Defendant appeared agitated. Mr. Phillips said the victim noticed the Defendant at about the same time. Mr. Phillips said that a bouncer put his hand on the victim and said, "[J]ust let it go," but that the victim "took off." Mr. Phillips said the victim ran toward the Defendant. Mr. Phillips said the Defendant took out a gun and began firing when the Defendant and the victim were within five feet of each other. Mr. Phillips said that he "[h]it the ground" and that he heard numerous shots. Mr. Phillips said that the Defendant tried to run toward some steps but was tackled by Mr. Parr. Mr. Phillips said that the victim was in the lower parking lot but that Mr. Phillips did not see how the victim ended up there. Mr. Phillips said that he stepped on the Defendant's hand as the Defendant lay in the parking lot to get the gun away from the

---

[2] In his testimony, Mr. Phillips identified one of the bouncers as Devin Pickle.

Defendant. Mr. Phillips said that he cleared the gun's chamber and that a bullet fell to the ground in the lower parking lot. He said he did not know what happened to the bullet. He said that he gave the gun to another person, whom he did not identify by name in his testimony, and that he performed CPR on the victim.

Mr. Phillips testified that he did not know that anyone else was with the victim and that he did not see anyone near the victim when the Defendant shot the victim. Mr. Phillips said he did not see anyone other than the victim moving toward the Defendant. Mr. Phillips estimated that about 200 people were outside the club during the incident and agreed that the victim had to run through the crowd to get to the Defendant. He agreed that the environment outside the club was "raucous" and said he did not hear the victim make any statements about the Defendant.

John Lawson testified that he was a patron of The Battery on March 23, 2014, and that he was later employed at the club as a disc jockey. He said he was outside the club on March 23 around 1:00 a.m. and saw a man walk up the steps, pull a weapon from his pants, and shoot the victim in the chest from a distance of four to five feet. Mr. Lawson said the victim was not moving toward the Defendant at the time of the shooting. Mr. Lawson said the victim "kind of froze" before the Defendant brought out the gun. Mr. Lawson said that when the shots began, he tackled several people to the ground. Mr. Lawson said that the Defendant fired until the Defendant "ran out of rounds" and that Mr. Lawson went down the stairs after the Defendant finished shooting. Mr. Lawson said he heard eight to ten or "maybe even more" shots. Mr. Lawson said the Defendant looked as if he were going to run away but that Mr. Parr tackled the Defendant in the lower parking lot. Mr. Lawson said he and others helped restrain the Defendant. Mr. Lawson said that after a minute or two, he extricated himself from the people restraining the Defendant and saw the gun "racked back" with nothing in it. Mr. Lawson said he took the gun inside the club and took it to Officer Cody Powell once the police arrived.

Mr. Lawson testified he had not seen any other individuals, including the victim's brother, with the victim but said he focused on the gun once the Defendant produced it. Mr. Lawson estimated the crowd at thirty to fifty people.

Mr. Lawson testified that he saw other individuals, including the victim's brother, who had been hit by gunfire. He said that when he noticed that the victim's brother had been shot in the back, the victim's brother was in the parking lot at the bottom of the steps. Mr. Lawson said the victim's brother was "very upset" and "[j]ust really mad." Mr. Lawson acknowledged that he did not see the victim's brother being shot and that he noticed him later.

Johnson City Police Officer Cody Powell testified that he responded to a call at The Battery on March 23, 2014, around 3:00 a.m. He said that when he arrived, he saw three people who appeared to be victims, people screaming, and a chaotic scene. He said a man approached him said the man had the gun. Officer Powell said he took the gun from the man and locked it in his trunk until he was able to give it to Investigator Richardson. Officer Powell did not recall whether he received the magazine separately from the gun.

Johnson City Police Detective Matthew Keller testified that he responded to the hospital after the March 23, 2014 shooting at The Battery. He said he interviewed the victim's brother, who appeared to be injured and had a gauze patch on his shoulder. Detective Keller said the victim's brother was "very emotionally distraught" and had trouble focusing on answering Detective Keller's questions. Detective Keller did not know whether the victim's brother had received pain medication. Detective Keller said that the victim's brother did not appear to be in pain but agreed that a person who had been shot three times would have pain.

Zachary Breedlove testified that he and his friends were at The Battery on March 23, 2014. He said they arrived around midnight and left around 3:00 a.m. He said he had four or five drinks that evening. He said he was outside waiting for a taxi when he heard about six gunshots. He said he ran and was grazed by a bullet. He said he never saw the shooter. He identified a photograph of a graze wound to his right buttock, which he agreed resulted from his having been hit by a bullet or bullet fragment.

Mr. Breedlove agreed that he walked to a gas station and called a friend to pick him up and that he went to the friend's home without seeking medical attention. He said that seeking medical treatment would have been more of a financial burden than it was worth.

Jonathan McInturff testified that on March 23, 2014, he and his brother were at The Battery celebrating his brother's birthday. He said he was there from 11:00 p.m. until 3:00 a.m. He admitted he was intoxicated and said he "[s]omewhat" recalled an incident that occurred as he left the parking lot. Mr. McInturff said he heard shots and ran, although he did not know what precipitated the shooting. When asked if he had "some contact with" the shots, he replied, "Somebody made that assumption, but, the doctor never told me that I had no [sic] bullets in my arm." He agreed that his arm was "in pretty good shape" before he went to the club on March 23. When shown a photograph exhibit, he said it depicted a spot "like a burn mark" on his arm that he did not have before he went to the club. He said he noticed a burning sensation in his arm

after the shooting. He said that he went to the hospital that evening and that an x-ray of his arm showed no metal or bullet fragments.

Johnson City Police Detective Bret Richardson testified that he investigated the scene. He said that ten .40 caliber cartridge casings, three bullet fragments, and a shoe were found. In addition, he said that he received three bullets which had been removed from the victim's body. He said he submitted the ballistic evidence and the gun to the Tennessee Bureau of Investigation (TBI) Laboratory.

TBI Forensic Scientist Teri Arney, an expert in firearms identification, testified that she examined a .40-caliber Smith & Wesson pistol, a magazine, ten cartridge casings from the scene, and a bullet fragment submitted by the Johnson City Police Department relative to this case. Agent Arney determined that the cartridge casings and bullet fragment had been fired from the pistol.

Agent Arrney testified that she later examined additional evidence, consisting of a bullet fragment and a bullet jacket from the scene and three bullets removed from the victim's body. She examined these items in conjunction with the pistol collected as evidence. She determined that the bullets from the victim's body had been fired from the pistol. She said that the items from the scene had the same rifling characteristics and were of the same caliber as the pistol but that they were too damaged to make a conclusive identification.

Nicole Masisan, M.D., an expert in forensic pathology, testified that she performed an autopsy of the victim's body. She said the victim had three gunshot wounds to the torso. She said one entered the left upper abdomen, penetrated the inferior vena cava and the aorta, and came to rest near the liver. She said a second entered the left lateral buttock, crossed through the abdomen, penetrated the rectum, and came to rest in front of the right hipbone. She said the third entered the left lower back, grazed the twelfth rib, and came to rest in the second lumbar vertebral body. She said that the shot to the left upper abdomen was fatal and that it was unlikely that either or both of the other two, on their own, would have killed the victim. She said that a gunshot such as the one to the victim's left upper abdomen would cause death "[p]otentially within seconds, definitely within minutes."

Dr. Masisan testified that the victim's blood alcohol content was 0.192 percent and that his urine tested positive for marijuana use. She said that the victim's face had a "red/black abrasion" on the left cheek with a surrounding bruise. She said that an abrasion could be caused by blunt force, a hit, a push, or a fall. She said it could have been caused by being hit with a bottle.

Dr. Masisan agreed that the victim was 6'4". She said that she had been unable to determine the distance from which the gunshots had been fired at the victim.

The Defendant elected not to testify or offer other evidence. The jury acquitted the Defendant of the charged offense of first degree premeditated murder of the victim but found the Defendant guilty of the lesser included offense of second degree murder. The jury found the Defendant guilty of misdemeanor assault of Zachary Breedlove. The jury acquitted the Defendant of felony reckless endangerment but found the Defendant guilty of the lesser included offense of misdemeanor reckless endangerment.

The trial court imposed concurrent sentences of forty years for second degree murder and eleven months and twenty-nine days for each of the two misdemeanor convictions. The court imposed the second degree murder conviction consecutively to the sentence for a conviction in another case. This appeal followed.

## I

## Sufficiency of the Evidence of Second Degree Murder

The Defendant contends that the evidence is insufficient to support his second degree murder conviction. He argues that the evidence shows he acted in self-defense. The State contends that the evidence is sufficient to support the conviction. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331

S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (Supp. 2009) (amended 2011, 2014). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

In Tennessee, a person who

is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b)(2)(A)-(C) (2014) (amended 2016, 2017). The force used in defense of self must be reasonable, given the circumstances. *State v. Renner*, 912 S.W.2d 701, 704 (Tenn. 1995).

Viewed in the light most favorable to the State, the evidence shows that the victim bumped into the Defendant inside The Battery and that they argued. The Defendant and the victim had been drinking alcohol, and the Defendant had been involved in earlier arguments with individuals other than the victim at the club. After the Defendant left the club, the victim was agitated, but Mr. Calandros was able to calm the victim before the victim left the club. The Defendant, who was angry, went quickly to Ms. Chappell's car and searched for his gun. After he found the gun, the Defendant put it in his pants and returned on foot to the area outside the club. The Defendant appeared agitated as he

returned and stopped to stare at the victim. The victim walked or ran toward the Defendant and, when they were about four to six feet apart, the victim "kind of froze." The Defendant took out the gun and fired repeated shots, three of which struck the victim in the torso. The evidence shows that the Defendant engaged in conduct that he was aware was reasonably certain to cause the victim's death.

Relative to the Defendant's self-defense claim, no evidence showed that the victim was armed, that he physically assaulted the Defendant, or that the victim threatened to harm the Defendant. To the contrary, although the evidence shows that the victim had been upset and had advanced toward the Defendant, the unarmed victim stopped and stood a few feet from the Defendant, but the Defendant pulled out the gun and opened fire. The evidence does not support a conclusion that the Defendant had a reasonable belief he was in imminent danger of death or serious bodily injury, that actual danger existed or that the Defendant had an honest belief of actual danger, or that the Defendant had a reasonable basis for believing he was in such danger. Further, the evidence does not show that the force used by the Defendant was reasonable in response to any potential threat the Defendant might have perceived when the victim advanced and stopped to stand near him.

The evidence is sufficient to support the Defendant's conviction. He is not entitled to relief on this basis.

## II

## Jury Selection Method

The Defendant contends that the trial court erred in its method of empaneling additional jurors, depriving him of a peremptory challenge. The State concedes that the court deviated from the procedure prescribed by Tennessee Rule of Criminal Procedure 24(f)(2) but contends that the Defendant has not shown how he was prejudiced. We agree with the State that the Defendant failed to establish prejudice from the court's deviation from Rule 24(f)(2).

Relative to the selection of additional jurors in order for one or more alternate jurors to be available for a trial, Rule 24(f)(2) provides:

> (f) Additional Jurors. Before jury selection begins, the court may call and impanel one or more jurors in addition to the regular jury of twelve persons. The following procedures apply:

(1) Same as Regular Jurors. The additional jurors shall be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the regular jurors.

(2) Methods of Impaneling Additional Jurors. The trial court may use either of the following methods to select and impanel additional jurors:

(A) Single Entity. During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number of jurors to reduce the jury to a body of twelve or such other number as the law provides. A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.

(B) Separate Entities. Following the selection of the jury of twelve regular jurors, the additional jurors shall be selected and impaneled as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who become unable or disqualified to perform their duties prior to the time the jury retires to consider its verdict. An alternate juror who does not replace a regular juror shall be discharged when the jury retires to consider its verdict.

The Defendant's complaint is that the trial court used the single entity method delineated by Rule 24(f)(2)(A) during the selection process for the twelve jurors but that the court used the separate entities method delineated by Rule 24(f)(2)(B) during the selection process for two alternate jurors. He argues that by this method, the court deprived him of a peremptory challenge.

-12-

The record reflects that the parties were each allotted eight peremptory challenges during the selection of the twelve jurors and that the Defendant exercised seven of his eight challenges. The court advised defense counsel that the Defendant did not retain his unexercised peremptory challenge for use during selection of the alternate jurors but that the Defendant would be allotted one peremptory challenge for each of the two alternate juror slots. One prospective additional juror was excused for cause by the trial court. Defense counsel elected not to exercise any peremptory challenges, and two additional jurors were selected. At the end of the proof, the court randomly selected two individuals of the fourteen seated. One person who was excused had been in the group of the initial twelve individuals selected, and the other had been one of the two selected as an additional juror. The remaining twelve jurors comprised the jury which decided the case.

Relative to the method of the selection of jurors and alternates, Rule 24(d) provides:

> (d) Exercising Peremptory Challenge. After the court conducts its initial examination and seats a tentative group of jurors not excluded for cause, the following procedure shall be followed until a full jury has been selected from those jurors and accepted by counsel:
>
> (1) At each round of peremptory challenges, counsel shall submit simultaneously to the court either a blank sheet of paper or a sheet of paper challenging one or more jurors in the group of the first twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) jurors who have been seated. Neither party shall make known the fact that the party has not challenged a juror.
>
> (2) Replacement jurors will be seated in the panel of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) in the order of their selection.
>
> (3) If necessary, additional replacement jurors will be examined for cause and, after passed, counsel will again submit simultaneously, and in writing, the name of any juror in the group of twelve (or more if additional jurors are seated under the single entity process of Rule 24(f)(2)(A)) that counsel elects to challenge peremptorily. Peremptory challenges may be directed to any member of the jury;

-13-

counsel are not limited to using such challenges against replacement jurors.

(4) Alternate jurors are selected in the same manner, unless the single entity process of Rule 24(f)(2)(A) is used.

Rule 24(e)(2) provides that a defendant in cases involving imprisonment for more than one year shall have eight peremptory challenges. Tenn. R. Crim. P. 24(e)(2). For the selection of each additional juror selected pursuant to Rule 24(f), a defendant is entitled to one peremptory challenge for each additional juror. *Id*. at (e)(4). An additional challenge may be used against a regular juror or an additional juror. *Id*.

The Advisory Commission Comments state, in pertinent part:

Subdivision (d) permits trial judges to seat more than twelve prospective jurors for purposes of voir dire--possibly but not necessarily a number equal to twelve plus the number of peremptories to each side and the number of alternates available. All of these persons in the jury "universe" could be questioned at once. Note that if the "separate entities" procedure of Rule 24(f)(2)(B) is used, challenges are initially made to only the first twelve seated. Note also that under this procedure "replacement jurors will be seated in the panel of twelve in the order of their selection."

For example, a judge might chose to impanel thirty-two prospects. Each would be assigned a number. If during the initial round of peremptory challenges jurors number 3 and 6 are excused, juror 13 would replace 3 and juror 14 would replace 6. By this method lawyers would know who is coming up next.

. . . .

Rule 24(f)(2)(A) gives the court the option of using a procedure that eliminates the distinction between regular and alternate jurors. This procedure should facilitate juror attention to the evidence. If the court decides to use extra jurors in case a regular juror becomes unable to serve, the additional juror is combined with the other jurors for all purposes during the trial. Thus, if a court decides to use twelve jurors plus two additional jurors, all fourteen jurors are considered to be the jurors during the entire trial. Under this new rule, before the jury retires to deliberate the

-14-

court will randomly deselect the additional jurors, leaving the desired number of jurors, ordinarily twelve. The deselected jurors are then discharged when the remaining jurors retire to deliberate.

Each side is given one peremptory challenge for each additional juror. Since under this model both regular and additional jurors are considered a part of a single jury, peremptory challenges may be used against any such juror, a process commonly known as "backstriking." This procedure provides counsel with considerable flexibility in the exercise of peremptory challenges.

A trial court's deviation from jury selection procedures is considered non-constitutional error. *State v. Frausto*, 463 S.W.3d 469, 484 (Tenn. 2015). In order to obtain relief when a deviation has occurred, a defendant must show that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." *See* T.R.A.P. 36(b); *Frausto*, 463 S.W.3d at 484; *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008).

We agree with the Defendant and the State that the trial court deviated from the rule by combining components of both the single entity and separate entities alternatives into a unique, hybrid method of jury selection. The inquiry becomes, then, whether the Defendant has shown that the error more probably than not affected the judgment or caused prejudice to the judicial process.

In that regard, we note that the Defendant was afforded eight peremptory challenges for use in the selection of the initial twelve jurors and that he exercised seven of them. He was afforded two additional peremptory challenges for the selection of the two additional jurors, and he exercised neither. He was permitted, consistent with Rule 24, to challenge jurors. Despite his argument that he was deprived of a peremptory challenge, he had one peremptory challenge remaining at the end of the selection process for the first twelve jurors, and he had two peremptory challenges remaining at the end of the selection process for the two additional jurors. The Defendant has not shown that the trial court's deviation deprived him of an actual opportunity to challenge a juror who sat on the final jury and decided the case. Although the court did not follow Rule 24 as it is written, the Defendant received, in substance, what the rule affords. The jury acquitted him of the charged offenses, including first degree murder, and convicted him of lesser included offenses. He has not shown that the error more probably than not affected the judgment.

-15-

Regarding prejudice to the judicial process, we note with concern the trial court's statement on the record that the procedure followed in this case was consistent with the practice in the judicial district for twenty-five years. Our supreme court has determined that substantial violations of Rule 24, as well as repeated violations, may constitute prejudice to the judicial process. *See Frausto*, 463 S.W.3d at 483-86; *State v. Lynn*, 924 S.W.2d 892, 894-98 (Tenn. 1996); *State v. Bondurant*, 4 S.W.3d 662, 666-70 (Tenn. 1999). Although we do not view the trial court's deviation from Rule 24 to have constituted prejudice to the judicial process in this case, we take this opportunity to echo our supreme court's admonition that "ignoring or rewriting the clear mandates of the Tennessee Rules of Criminal Procedure is not an option available to trial courts." *Frausto*, 463 S.W.3d at 482-83.

The Defendant is not entitled to relief on this basis.

**III**

**Admissibility of the Defendant's Prior Convictions**

The Defendant contends that the court erred in ruling that his prior convictions for failure to appear and robbery were admissible as impeachment evidence if he testified. The State counters that the Defendant waived appellate consideration of the issue by failing to raise it with specificity in the motion for a new trial and that he is not entitled to plain error relief.

First, we will consider the State's argument that the Defendant waived appellate consideration of the issue by failing to preserve it adequately. The record reflects that the State filed a pretrial notice of its intent to impeach the Defendant with prior convictions for failure to appear, robbery, and two counts of aggravated assault. The Defendant responded with a motion to exclude the convictions on the following bases: (1) the failure to appear and assault convictions were irrelevant to the issue of the Defendant's truthfulness and (2) any probative value of the evidence of the robbery and aggravated assault convictions was outweighed by the prejudicial effect because those convictions and the charged offenses were violent felonies. The issue was litigated in a jury-out hearing. One of the allegations in the Defendant's motion for a new trial stated:

> The Court erred by ruling that the Defendant's prior convictions for Failure to Appear and Robbery would be admissible for purposes of impeachment. This ruling was a key factor in the Defendant not taking the witness stand in his own defense, and the Defendant's testimony was needed to support the theory that he was acting in self-defense.

Tennessee Rule of Appellate Procedure 3(e) provides, in pertinent part, "[I]n all cases tried by a jury, no issues presented for review shall be predicated upon error in the admission or exclusion of evidence, . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." This court has said that the grounds upon which a defendant alleges he should receive a new trial "must be specified with reasonable certainty . . . to advise the trial court and opposing counsel of the alleged error or regularity . . . and to enable the appellate courts to see that the alleged error was presented to the trial court for correction as required by [Tennessee Rule of Appellate Procedure 36(a)]." *State v. King*, 622 S.W.2d 77, 79 (Tenn. Crim. App. 1981).

The State argues that the Defendant's statement of the issue in the motion for a new trial was insufficient to preserve it for appellate review because he failed to identify a legal basis upon which he relied and because he failed to allege why the trial court erred by ruling that the prior convictions would be admissible. As we have stated, the court's ruling that the robbery and failure to appear convictions were admissible was precipitated by a notice filed by the State, which the Defendant opposed. The State's notice identified Tennessee Rules of Evidence 608 and 609 the bases for admissibility.[3] The Defendant responded to the State's notice with a motion to prohibit use of the prior convictions. The motion cited general concerns of irrelevance to the issue of truthfulness and Tennessee Rule of Evidence 403 as reasons the convictions should be excluded. The legal bases identified by the parties were litigated in the trial court. On appeal, the Defendant has not presented a different legal theory upon which he alleges error. We conclude, based upon the facts and circumstances of this case, that appellate consideration of the issue is not waived.

We turn to the merits of the issue. Tennessee Rule of Evidence 609 permits, subject to time limitations that are not pertinent in this case, the use of previous convictions to impeach a witness's credibility, provided the crime was punishable by death or imprisonment of more than one year or the crime involved dishonesty or false statements. Tenn. R. Evid. 609(a)(2). Impeachment evidence admitted pursuant to Rule 609(a) "is limited to the fact of a former conviction and that the crime was committed." *State v. Taylor*, 993 S.W.2d 33, 35 (Tenn. 1999). Previous convictions cannot be admitted as evidence to show a defendant's propensity to commit the charged offense, regardless of whether witness credibility is a central issue at a trial. *See* Tenn. R. Evid.

---

[3] Although the State cited Tennessee Rule of Evidence 608 in the notice it filed in the trial court, the issue raised on appeal pertains to prior criminal convictions. Rule 608 pertains to conduct which did not result in criminal convictions. *See* Tenn. R. Evid. 608. The trial court did not rely on Rule 608 in its ruling, and the parties have not argued on appeal that it is controlling. As such, our analysis does not include consideration of Rule 608.

404(b).  When the State intends to impeach a criminal defendant with a prior conviction, the trial court must, upon request by the Defendant, conduct a hearing to determine whether the prior conviction's probative value relative to the issue of the defendant's credibility outweighs the prejudicial effect of the evidence relative to the substantive issues.  Tenn. R. Evid. 609(a)(3).

Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record."  *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).  In the context of Rule 609 rulings, we afford deference to the trial court's determination unless the trial court failed to follow the procedural requirements of the rule.  *See State v. Lankford*, 298 S.W.3d 176, 182 (Tenn. Crim. App. 2008).

The record in the present case reflects that the trial court ruled the aggravated assault convictions would be inadmissible to impeach the Defendant, should he choose to testify, because these convictions were similar in nature to the charged offenses.  Regarding the failure to appear conviction, the court stated:

> [T]he court will allow [the conviction] to be used, finding that while [defense counsel] is correct the probative value of that [may be] slight, the same could be said . . . about the prejudicial value.  It is a felony conviction.  He failed to appear for court and . . . the jury will be instructed that he would be judged by that prior conviction only for the issue of creditability [sic], not propensity to commit crime.  So, there will be a special jury instruction for that failure to appear.

Regarding the robbery conviction, the court stated:

> The robbery is a little bit more troublesome for this court.  It is a serious crime, however, the reasons to exclude it would be the danger that the jury would find, once again, propensity to commit crimes because he was convicted of a robbery.  And it is, as we stand now, six years . . . past from the sentence date.  The reasons to allow it in is the fact that it is not an aggravated robbery, does not involve a deadly weapon.  It's simply a robbery of taking money from someone which . . . does involve a crime of moral turpitude and it is a felony conviction.  For those reasons and the fact that it does not involve a weapon as an aggravated robbery, the court will allow the use of the robbery conviction for . . . impeachment purposes finding that the unfair prejudice is not outweighed by the probative value of

-18-

that prior conviction. [sic] Once again, the jury will be instructed that they are not to consider that for propensity purposes. They are to consider that only as one factor to judge the creditability [sic] of the defendant should he elect to testify[.]

The record reflects that the trial court followed the procedural requirements of the rule, and we will afford deference to its determination. Regarding the felony failure to appear conviction, the court considered neither the probative value nor the prejudicial effect to be great. The Defendant complains that the court did not weigh the probative value against the prejudicial effect. Although the court did not explicitly state that the probative value outweighed the prejudicial effect, it is apparent from the court's statements on the record that it considered the competing interests and weighed the probative value of the evidence as greater than the prejudicial effect of admitting the evidence. The record shows that the court considered failure to appear to reflect adversely upon the Defendant's credibility. *See State v. Charles Clay Young*, No. 01C01-9601-CC-00195, 1997 WL 469900, at *5-6 (Tenn. Crim. App. Aug. 15, 1997) (holding that the defendant failed to show plain error in the trial court's ruling that the defendant's conviction for "bail jumping"[4] was admissible for impeachment purposes, reasoning that the defendant's failing to appear reflected upon his credibility), *perm. app. denied* (Tenn. Mar. 2, 1998); *cf. State v. Reginald Dewayne Terry*, No. M2011-01891-CCA-R3-CD, 2012 WL 5873518, at *6-8 (Tenn. Crim. App. Nov. 19, 2012) (holding that a trial court erred in ruling that a defendant could not cross-examine the victim about her failure to appear at the defendant's previous trial date and stating that the victim's failure to obey a subpoena reflected upon her credibility as a witness). *But see State v. Kevin Lane Farrar*, No. M2001-01370-CCA-R3-CD, 2002 WL 560959, at *8-9 (Tenn. Crim. App. Apr. 16, 2002) (disagreeing with the trial court's conclusion that a witness's misdemeanor failure to appear conviction was probative of the witness's truthfulness but concluding that the court committed harmless error in permitting cross-examination of the witness about the conviction), *perm. app. denied* (Tenn. Oct. 7, 2002).

Failure to appear requires that a defendant knowingly failed to appear at a court or other official proceeding as directed by lawful authority. *See* T.C.A. § 39-16-609 (2014). Failure to appear is a felony if the underlying offense for which the defendant failed to appear is a Class A misdemeanor or a felony. *Id.* § 39-16-609(e). As we have stated, the trial court considered knowingly failing to appear, notwithstanding lawful authority

---

[4] The Sentencing Commission Comments to Tennessee Code Annotated section 39-16-609 note that the current statute designating failure to appear as a criminal offense is broader than the former section 39-5-720, "which only reached 'bail jumping' or the failure to appear if released without bail." We conclude, for the purposes of this impeachment evidence analysis, that bail jumping is equivalent to failure to appear.

compelling the Defendant's attendance, to be probative evidence relative to truthfulness and the Defendant's credibility as a witness in the present proceeding, and the court weighed this probative value as greater than the weight of any prejudicial effect of allowing the evidence. Upon review, we conclude that the trial court did not abuse its discretion in ruling that the Defendant could be impeached with his prior conviction for felony failure to appear.

Turning to the robbery conviction, the trial court found that it was probative of truthfulness. The court expressed concern that the jury might misuse the prior conviction evidence as propensity evidence but stated that a limiting instruction would caution the jury to consider the evidence only on the issue of the Defendant's credibility as a witness. The court noted that robbery did not involve a weapon, which was in contrast to the facts of the charged offenses. The court weighed the probative value of the evidence against its prejudicial effect. Although the court stated that the "unfair prejudice is not outweighed by the probative value of that prior conviction," it is apparent from the context that the court misspoke and found the probative value was not outweighed by the unfair prejudice in admitting the evidence.

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401(a) (2014). "Robbery is a crime involving dishonesty and may be used for impeachment purposes." *State v. Galmore*, 994 S.W.2d 120, 122 (Tenn. 1999); *see State v. Caruthers*, 676 S.W.2d 935, 941 (Tenn. 1984). The Defendant argues, though, that the prejudicial effect of the robbery conviction was great because, like the charged offenses, robbery involves violence. We note, first, that robbery may be committed by violence *or* placing the victim in fear. *See* T.C.A. § 39-13-401(a). In any event, the trial court found it significant that robbery does not require the use of a weapon, whereas the facts involved in the trial involved the Defendant's use of a weapon. Although not noted by the trial court, we observe that the facts of the charged offenses did not involve a theft. Upon review, we conclude that the trial court did not abuse its discretion in ruling that the Defendant could be impeached with his prior conviction for robbery. *See State v. Marty Lavern Pyburn*, No. M2003-01090-CCA-R3-CD, 2004 WL 1857109, at *11-12 (Tenn. Crim. App. Aug. 16, 2004) (holding that the trial court did not err in allowing impeachment of the defendant with his prior aggravated robbery conviction at his first degree murder trial), *perm. app. denied* (Tenn. Dec. 20, 2004). The Defendant is not entitled to relief on this basis.

# IV

## Cumulative Error

The Defendant contends that he is entitled to a new trial due to cumulative trial error. Because we have determined that a single error occurred during the jury selection process and that this individual error was harmless, the issue is without merit.

# V

## Sentencing

Finally, the Defendant contends that the trial court erred by applying a sentencing enhancement factor for multiple victims and in imposing a maximum forty-year term for second degree murder. The State contends that the Defendant has not shown that the sentence was improper. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

-21-

At the sentencing hearing, the victim's mother read a statement and testified about the impact of the victim's death on the victim's family. The victim's mother, stepmother, and father testified about the impact the victim's death had on them and their family. The victim's stepmother testified that the victim had a five-year-old daughter.

A former college basketball teammate of the victim's testified that the victim was "days away from graduation" at the time of the victim's death. The teammate testified about the impact of the victim's death on members of the basketball team and former classmates.

The presentence report was received as an exhibit. It reflects that the Defendant was twenty-six years old at sentencing. He had prior convictions for trespassing, being a felon in possession of a firearm, failure to appear, and two counts of aggravated assault. In addition, he had been adjudicated delinquent as a juvenile for aggravated robbery. He had his probation revoked for the juvenile adjudication, had been placed in custody with the Department of Children's Services, and had his probation revoked for offenses committed as an adult. The latter revocation occurred approximately eight months before the offenses in the present case. He had pending revocation warrants for failure to appear, attempted first degree murder, aggravated robbery, and aggravated assault convictions, based upon the commission of the offenses in the present case.[5] The Defendant acknowledged to the presentence report preparer that he had started and stopped using alcohol at age eighteen, and he denied drug use. He reported that he was not disabled or under the care of a physician. He did not report any work history to the presentence report preparer, although a probation violation report attached to the presentence report states that the Defendant became employed a few days before the offenses in the present case.

The trial court found that the Defendant was a Range II offender. The court stated that the Defendant had "little, if any factors that would weigh in [his] favor" and noted that the Defendant had several felony convictions since becoming an adult, as well as the juvenile adjudication for aggravated robbery. The court enhanced the Defendant's sentences based upon his prior convictions, noting that the Defendant had convictions in addition to those necessary to classify him as a Range II offender. *See* T.C.A. § 40-35-114(1) (2012) (amended 2015, 2016, 2017). The court also enhanced the Defendant's second degree murder sentence based upon the fact that the offense involved more than one victim, noting that at least two other people were struck by bullets or shrapnel. *See id.* § 40-35-114(3). The court found that the Defendant committed the offenses while on

[5] The trial court revoked the Defendant's probation at the sentencing hearing. The revocation is not a subject of this appeal.

probation and had failed to comply with a sentence involving community release. *See id.* § 40-25-114(8), (13). The court applied great weight to the Defendant's commission of the offenses while on probation. The court also enhanced the sentences based upon the Defendant's lack of hesitation to commit crimes when the risk to human life was high, noting that many people were present in the parking lot when the shootings occurred. *See id.* § 40-35-114(10). The court found that no mitigating factors applied. *See id.* § 40-35-113 (2012).

For second degree murder, the court noted the sentencing range of twenty-five to forty years and found that the maximum sentence was appropriate. The court imposed sentences of eleven months and twenty-nine days each for the two misdemeanor convictions. The court noted the Defendant's long history of involvement with the criminal justice system, the need to protect the public from him, and his "extremely low" potential for rehabilitation. The court recounted the trial evidence and stated, "The facts and circumstances of this particular case weigh heavily in favor of a maximum sentence[.]"

The Defendant complains that the trial court erred in enhancing his sentence based upon the multiple victims enhancement factor. *See id.* § 40-35-114(3). We agree. Although the evidence showed that individuals other than the deceased victim were injured when the Defendant fired shots in a crowded area, the Defendant was charged separately with offenses which identified Zachary Breedlove and Jonathan McInturff as the victims. *See, e.g.*, *State v. Imfield*, 70 S.W.3d 698, 706 (Tenn. 2002) (stating that the multiple victims enhancement factor did not apply to a conviction which was obtained based upon a named victim and that application of the factor based upon the presence of individuals on whose behalf no charges were filed was impermissible); *State v. Reid*, 91 S.W.3d 247, 310-11 (Tenn. 2002); *State v. Williamson*, 919 S.W.2d 69, 72 (Tenn. Crim. App. 1995); *State v. Raines*, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994) (holding that a "victim," for purposes of T.C.A. § 40-35-114(3), is a "person or entity that is injured, killed, had property stolen, or had property destroyed by the perpetrator of the crime").

The remaining question is whether the court sentenced the Defendant excessively, given the inapplicability of the multiple victims enhancement factor and the weight the court afforded the remaining factors, along with the facts and circumstances of the case. In that regard, we note that despite the misapplication of enhancement factor (3), the court considered the relevant statutes and considerations along with the facts and circumstances of the case and that its reasoning was otherwise consistent with the purposes and principles of sentencing. The sentence the court imposed was within the appropriate range. As such, the Defendant cannot overcome the presumption of

reasonableness we must afford to the trial court's determination. *See Bise*, 380 S.W.3d at 706. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

ROBERT H. MONTGOMERY, JR., JUDGE